**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WILLIAM JOHNSON, | |
| Petitioner, | Case No. 06 C 5351 |
| v. | Hon. Harry D. Leinenweber |
| JOSEPH LOFTUS, Warden, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner William Johnson's (hereinafter, "Petitioner") *pro se* Petition for a Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254.

On May 17, 2001, Petitioner was convicted in the Circuit Court of Cook County, Illinois, of armed robbery, aggravated battery, and unlawful use of a weapon in connection with the November 11, 1998, robbery of a McDonald's restaurant in Markham, Illinois. On appeal, the Illinois Court of Appeals affirmed the convictions in spite of finding errors in Petitioner's trial, concluding that the errors had been harmless. After the Illinois Supreme Court denied Petitioner leave to appeal, Petitioner filed the instant petition in this Court. For the reasons that follow, Petitioner's petition for writ of *habeas corpus* is **conditionally granted.**

# I.  BACKGROUND

On November 11, 1998, a man with a sawed-off shotgun robbed a McDonald's restaurant in Markham, Illinois, and fled out the door to the restaurant's parking lot.  When the police arrived, they found Petitioner's car in the lot.  Behind the driver's seat was a shotgun and a large amount of wadded-up cash.  Police eventually developed information that a customer at the Trak Auto store across the street from the McDonald's had given Petitioner a ride to a nearby motel.  A short time later, officers arrested Petitioner, along with a woman, at the motel.  Police subsequently also learned that Petitioner's cousin, Jameel White ("White"), was with Petitioner that day.  After being arrested, White told police that Petitioner robbed the McDonald's and then procured a ride for the two of them out of the area.  That evening, from a police station lineup, two McDonald's cashiers identified Petitioner as the robber.

Thirteen witnesses testified at Petitioner's trial, and their testimonies were often conflicting and confusing.  In sum, the state's theory was that Petitioner, after stopping at the McDonald's at Jameel White's request, pulled out a shotgun and robbed the restaurant, depositing the gun and cash in his car outside before fleeing the area.  The evidence supporting the state's case primarily comprised the following:  (1) the testimony of Jameel White that while White was eating at the McDonald's,

Petitioner unexpectedly pulled a sawed-off shotgun from his pants and approached the counter; that White fled immediately and heard a shot when he exited the restaurant; that White then saw Petitioner exit the McDonald's with wads of cash in his hand and dump the cash and gun into his car before running after White across the road; and that Petitioner arranged a ride from the area in the van of a man that White did not know; (2) the police line-up and in-court identifications of Petitioner by two McDonald's employees, Monique Nolan and Susanna Ramos; (3) the testimony of Ron Tate ("Tate"), the manager of the Trak Auto store across the road from the McDonald's, that a man who looked like Petitioner was in his store that afternoon and showed Tate several crumpled-up bills, yelling "I got money," and that one of Tate's employees later found crumpled money on a shelf in the store; (4) the testimony of Thomas Gaston ("Gaston") that he gave Petitioner and White a ride in his van that Petitioner gave him money for the ride, and that Gaston ultimately took Petitioner to a motel; and (5) police testimony that officers recovered from Petitioner a piece of a torn $20 bill that matched a torn $20 bill recovered from Petitioner's car.

The defense contended that it was Jameel White and a friend who robbed the McDonald's while Petitioner was across the street buying automotive supplies. To this end, the defense attacked White's testimony as implausible and inconsistent with itself and

with the testimony of other, more disinterested witnesses. The defense also vigorously contested the reliability of the state's identification evidence, first by pointing to the witnesses' varying descriptions of the robber, including an initial description that matched Jameel White, and then by attacking the police lineups as incomplete, given the exclusion of White from them even though he was in custody, and suggestive because Petitioner was the only lineup participant that matched the description the police were working with. The defense also pointed to various other purported failings and irregularities in the investigation, including the officers' failure to inventory the alleged recovery of the $20 bill from Petitioner's person or report receiving information implicating Jameel White.

Petitioner also testified in his own defense. In brief, he testified that White and a friend of White's, driving Petitioner's car, dropped Petitioner off at Trak Auto so Petitioner could buy some oil and transmission fluid while White and his friend went to get something to eat. According to Petitioner's testimony, White reappeared at the Trak Auto alone and on foot and told Petitioner that he had gotten in some trouble and had left Petitioner's car across the road. Petitioner testified that ultimately, after White secured a ride from a Trak Auto customer, Petitioner and White rode back to Petitioner's parents' house, but Petitioner continued on to a motel after encountering a girlfriend with whom he had previously

made plans.  The jury convicted Petitioner of armed robbery, aggravated battery, and unlawful use of a weapon but acquitted him of attempted murder.  The court sentenced Petitioner to 25 years for the robbery, 15 years for the battery, and 10 years for the weapon charge, all to run consecutively.

Petitioner raised eight claims on appeal to the Illinois Court of Appeals:  (1) that the state's questions and comments regarding his post-arrest silence violated his rights to a fair trial, due process of law, and against self-incrimination under the rule in *Doyle v. Ohio*, 426 U.S. 610 (1976); (2) that the state committed reversible error in questioning him about prior convictions; (3) that the trial court's oral jury instruction for armed robbery and unlawful use of a weapon misstated the state's burden of proof; (4) that the trial court erroneously denied his motion to suppress unnecessarily suggestive identification evidence; (5) that the trial court misstated the law during jury instructions regarding evaluation of eyewitness testimony; (6)  that the state failed to prove the mental state requirement of the aggravated battery charge beyond a reasonable doubt; (7) that his trial counsel was ineffective for:  (a) failing to request that the court define the mental state element on the aggravated batter count; (b) failing to request an instruction that Petitioner was not required to answer questions before trial; (c) failing to object to the state's rebuttal argument comments on Petitioner's post-arrest silence; and

(d) failing to object to the improper jury instructions; and (8) that the mittimus should be corrected to reflect 966 days' credit for time served.

The Appeals Court affirmed Petitioner's convictions but did correct the mittimus as Petitioner requested.

Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, raising claims that the appellate court conducted erroneous harmless error analyses on his *Doyle* claim, his prior convictions claim, and his eyewitness testimony instruction claim; and an erroneous plain error analysis regarding his oral jury instruction claim. The court denied the petition.

Now, on *habeas*, Petitioner reprises each of the claims rejected by the Illinois Court of Appeals, with the exception of his suggestive identification evidence claim.

## II.  DISCUSSION

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") entitles a state prisoner to a writ of *habeas corpus* if the judgment underlying imprisonment violates the United States Constitution. *Williams v. Taylor*, 529 U.S. 362, 375 (2000). To this end, a *habeas* petitioner must show that the state court decision:  (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (2); *see Ellsworth v. Levenhagen*, 248 F.3d 634, 638 (7th Cir. 2001). Petitioner asserts several grounds for relief under this standard, but as explained below, only the first one is reviewable on the merits.

## A. Doyle v. Ohio

Petitioner contends that the state violated his Fifth and Fourteenth Amendment rights by using his post-arrest silence to impeach his testimony, and that his conviction must be overturned, because contrary to the state courts' findings, this error was not harmless. First, Petitioner is correct that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). This rule rests on the "fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainright v. Greenfield*, 474 U.S. 284, 291 (1986) (quotation omitted).

The Illinois Court of Appeals agreed with Petitioner that the state ran afoul of *Doyle v. Ohio* when the prosecutor repeatedly cross-examined him regarding, and then commented in rebuttal argument on, Petitioner's failure to tell his story to police following his arrest. *People v. Johnson*, No. 1-01-2490, slip op.

at 13 (Ill. App. Ct. September 21, 2004). That court, however, concluded that the *Doyle* violations were harmless under the standard in *Chapman v. California*, 386 U.S. 18 (1967), because there was an "overwhelming quantum of evidence of [Petitioner]'s guilt." *Johnson*, No. 1-01-2490, slip op. at 20. Specifically, the court was persuaded by the two eyewitness identifications. *Id.* at 20-22.

### 1. *Underlying Doyle Violation*

As noted above, under *Doyle*, the state may not impeach a defendant's trial testimony with his post-arrest silence. It is undisputed that the state on numerous occasions, both during its cross-examination of Petitioner and during its rebuttal argument, questioned why Petitioner did not tell his story to police following his arrest. The state both on appeal and now has argued that *Doyle* is not implicated here because Petitioner gave a statement to the State's Attorney the day after his arrest and therefore waived his right to remain silent and can be impeached both by the statement he made and by his silence thereafter. The appeals court rejected this argument, however, because (a) Petitioner's statement to the State's Attorney was short, ambiguous, and not inconsistent with his trial testimony, and (b) fairness precluded the state from using the statement to overcome Petitioner's *Doyle* protection because, in violation of state

discovery rules, the state had previously failed to turn the statement over to the defense.  *Id.* at 15-19.

This Court concurs with the Illinois Court of Appeals that the state violated Petitioner's rights under *Doyle v. Ohio*. Petitioner's statement to the State's Attorney, which essentially only addressed what he did early on the morning of the robbery and what he had planned to do that evening, was not sufficiently inconsistent with his trial testimony to constitute of a waiver of constitutional protections.  The Court additionally cannot disagree with the view that it would be improper to allow the state to use Petitioner's statement to show a *Doyle* waiver after having withheld the statement from the defense for all other purposes.

### *2. Harmless Error*

As the Illinois Court of Appeals found *Doyle* error, and this Court does not dispute that finding, the success or failure of Petitioner's claim really turns on the issue of harmlessness – an issue which, as it would happen, is fresh in the federal courts' minds.  This summer, in *Fry v. Pliler*, 127 S.Ct. 2321, 2328 (June 11, 2007), the Supreme Court made clear that federal *habeas* courts conducting harmless error review "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]." Moreover, the *Brecht* standard applies "whether or not the state

appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." *Id.* Consequently, this Court's task is not to simply scrutinize the Illinois Court of Appeals' decision, but rather it is to apply *Brecht* independently.

The Court also notes that even though *Fry* was decided during the pendency of this Petition, its holding governs this Court's review of the Illinois courts' harmless error determination because harmless error "is not a rule concerning what state courts must do and therefore may change without being thought impermissibly retroactive." *See Rodriguez v. Chandler*, 492 F.3d 863, 865 (7th Cir. 2007).

Under *Brecht*, this Court must determine whether the errors in Petitioner's trial resulted in "actual prejudice" to him -*, i.e.*, had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. U.S.*, 328 U.S., at 776. This means that the reviewing court must "ponder[] all that happened without stripping the erroneous action from the whole. . . ." *Fry*, 127 S.Ct. at 2328 (Stevens, J., concurring) (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946)). Courts performing a *Brecht* analysis consider factors such as the centrality of the evidence that is the subject of the error, *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1053 (7th Cir. 2006), the believability of the defense, *U.S. v. Gant*, 17 F.3d 935, 944 (7th Cir. 1994), the strength of the

state's overall case, *Lieberman v.* Washington, 128 F.3d 1085, 1096 (7th Cir. 1997), and the frequency, intensity, and egregiousness of the constitutional violation, *Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2005) (collecting cases). *See also*, *Phelps v. Duckworth*, 772, F.2d 1410, 1413 (7th Cir. 1985) (decided under the *Chapman* standard, considering additional factors such as the use to which the prosecution puts the post-arrest silence, which party elected to pursue the line of questioning, and the opportunity the trial judge had to grant a motion for mistrial or give curative instructions).

Additionally, although *Brecht* is a more deferential standard than *Chapman*, the burden remains on the state to show harmlessness: "when a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict. . . .'" *Fry*, 127 S.Ct. at 2328 n.3 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). *See also*, *Fry*, 127 S.Ct. at 2328-2330 (emphasizing that *Brecht* "imposes a substantial burden of persuasion on the State," and that when federal habeas courts find constitutional error, "they may not lightly discount its significance") (Stevens, J., concurring).

After evaluating the *Brecht* factors in Petitioner's case, especially the egregiousness of the error, the centrality of Petitioner's credibility to the defense, the plausibility of the defense, and the weaknesses in the state's case, this Court retains

"grave doubts" regarding the harmlessness of the *Doyle* errors in Petitioner's trial. As such, the law requires a finding that the errors were not harmless.

*a. The Egregiousness of the Doyle Violation*

The state's violation of *Doyle* in this case was substantial, deliberate, and flagrant. Roughly the last third of the state's cross-examination of Petitioner focused solely on using his failure tell his story to law enforcement to impeach his testimony. The following excerpts give the flavor of this line of questioning:

> Q. Listen to my question. When you were at the police station that day a couple of hours after the robbery, did you tell the police that you loaned your car that was involved in the robbery to your cousin, Jameel? Did you tell police that? (R. at K-130.)

* * *

> Q. The State's Attorney came out to talk to you, and did you tell the State's Attorney that you loaned your car to your cousin, the car that was involved in the McDonald's, did you tell him that just the very next day after the robbery? (R. at K-131.)

* * *

> Q. Sir, listen to my question, yes or no. The very afternoon when you were at the police station, a suspect in this armed robbery that you tell us you had nothing to do with and that you had loaned your car to your cousin, Jameel, did you tell the police that you loaned your car to your cousin, Jameel?

> A. No.

Q. Did you tell the police that your cousin,
   Jameel, was with this unknown person who you
   now describe as being a couple of inches
   taller than your cousin, Jameel, and about 160
   pounds? Did you tell the police that?

                        * * *

Q. No, in the whole time this case has been
   pending, did you tell the Markham police ever
   about this unknown person? (R. at K-133.)

                        * * *

Q. This is the first time anybody is hearing this
   story when this all occurred on November 11 of
   1998, right? (R. at K-133.)

                        * * *

Q. Now, when you talked with the State's Attorney
   that day, the day after this incident,
   McDonald's robbery, you didn't tell him that
   your cousin admitted doing a lick, did you?
   (R. at K-135.)

In total, the state asked Petitioner twenty-five times about

his failure to tell the police his story. In pursuing this line of

questioning, the state fought through repeated objections by

defense counsel. On ten occasions, the Court sustained the

defense's objections, yet the state persisted. Ultimately, the

state's zeal regarding Petitioner's post-arrest silence prompted

the court to admonish the state: "[t]hat is about eight in a row,

Mr. State's Attorney. You're getting very close to a mistrial

right here. Very close." (R. at K-137.) The state responded to

this admonishment by asking Petitioner, "Sir, isn't it true that

you told the State's Attorney nothing about the story that you told

- 13 -

here in court today; isn't that right?"  (R. at K-137.)  This question also drew an objection that the court sustained.

The *Doyle* violations did not end with cross-examination.  The state ended its rebuttal argument by returning to the issue.  Knowing that there would be no sur-rebuttal, the state made explicit for the jury why it should it should reject Petitioner's testimony as incredible based on his post-arrest silence:

> [Petitioner] knew how damning it was in this courtroom to hear him identified by his own cousin, a person that he lived with for awhile tell exactly what he told the police back on November 11, 1998, right after this happened, the same thing he came in and told you today.
>
> * * *
>
> So what did [Petitioner] do?  He got up and he told you well, it wasn't me, it was him.  But yet when he had the opportunity, did he call the police?  Did he say anything?  No.  It's only after he heard his cousin come in, stand up, and tell you the same thing he told the police two and a half years ago did he say this.  That is why I told you, ladies and gentlemen, you must take in, you must consider a person's motivation to lie in assessing the credibility of their story.  (R. at K-186-187.)

Faced with this record, it is difficult not to conclude that the state's *Doyle* violation was not only deliberate – it was strategic.  A significant portion of Petitioner's defense turned on a credibility battle between Petitioner and Jameel White.  The state relied substantially on White's testimony to establish Petitioner's exclusive role in the robbery, from its purportedly

unexpected beginning to the getaway. The defense, for its part, relied substantially on Petitioner's testimony that White and his friend robbed the McDonald's while Petitioner was across the road. The state presented no forensic evidence linking Petitioner to the robbery, and as will be discussed below, the state's identification evidence was problematic. Consequently, those aspects of the trial pertaining to Petitioner's credibility, like the state's impeachment of him, were especially important to the outcome of the trial.

### b. *The Strength of the State's Evidence of Guilt*

The state contends, as the Illinois Court of Appeals found, that the *Doyle* errors here were harmless because of the "overwhelming quantum of evidence" of Petitioner's guilt. And indeed, courts have generally found harmlessness when there was "overwhelming" evidence of guilt, *see, e.g.*, *Lieberman*, 128 F.3d at 1096, or the state's case was "very strong," *see, e.g.*, *Gant*, 17 F.3d at 944. In this Court's view, however, the case against Petitioner, while robust in certain respects, was far from overwhelming and in any case was not so strong as to overcome the evidentiary significance and egregiousness of the *Doyle* errors during his trial.

### (i) *The Eyewitness Identifications*

There were two general problems with the state's identification evidence in this case. First, the state's

identification witnesses, Monique Nolan ("Nolan") and Suzanna Ramos ("Ramos"), gave vague and inconsistent descriptions of the robber and the robbery. Nolan's testimony conflicted with her own preliminary hearing testimony and with her statements to police on the day of the robbery. Most significantly, at trial, Nolan described the robber as "[b]lack, skinny, with a black shirt with a brown vest, with some black pants with black socks with dirty gym shoes." (R. at I-24.) According to police reports and the testimony of the responding officer, however, on the day of the robbery Nolan described the offender to police as "a 5'6" black male, 160 pounds, approximately 20 years old, and wearing blue jeans and a black shirt," which was, in fact, the suspect description broadcast over the police radio on that day. (R. at I-68.) Additionally, at trial, Nolan testified that a lone man approached the counter and demanded money. The day of the robbery, however, Nolan told the responding officer that the robber approached the counter with another black male. (R. at I-88.) Further, at the preliminary hearing, Nolan testified that she never even saw the robber approach the counter at all – that the first time she saw him was when he came around the counter, when his back would have been to her. (R. at I-57.) At trial, Nolan also insisted that she had a completely open view of the robber, (R. at I-52), and that she was looking at the robber "constantly" during the robbery, (R. at I-38). But when confronted with a diagram of

the McDonald's, Nolan admitted that during the robbery she was "out of the way" in the drive-through corner and observed the scene while "peeking out" from behind a wall.  (R. at I-62-64.)

Ramos's testimony was more consistent then Nolan's, but it added little to the state's case.  Ramos described the offender through a Spanish interpreter only as "black, tall, thin."  (R. at I-92.)  On cross, she added that he was wearing black pants and a brown jacket.  (R. at J-17.)

In addition to the inconsistencies and vagueness in Nolan's and Ramos's testimonies, in certain ways their testimonies actively undermined their own identifications.  Specifically, as noted above, at trial Nolan testified that the robber wore black pants and a "brown vest."  (R. at I-24, 82.)  Ramos, for her part, testified that the robber was wearing black pants and a brown jacket.  (R. at J-17.)  Yet it was undisputed at trial that Petitioner was wearing blue jeans and a black shirt the entire day on the day of the robbery, and that police never found anyone with a brown jacket.

The second general problem with the state's identification evidence was that the lineups in which Nolan and Ramos identified Petitioner were of questionable reliability.  The description police ultimately used to construct the lineups was of a tall, thin black man wearing blue jeans and a black shirt (a notably different description from that disseminated by police right after the

robbery).  Petitioner was the only person in the lineup even arguably matching the description.  The lineup consisted of four people:  one 37-year-old man approximately 5'6" and 140 pounds, with no facial hear, wearing red pants with a red and white plaid shirt; a 6'2", 220 pound man with a thick mustache and wearing black pants and a black jacket with a white shirt; a 20-year-old man around 5'7", 160 pounds, with no facial hair, wearing gray-black pants and a dark gray hooded sweatshirt with writing on it; and Petitioner, who was 40 years old, 5'10", 160 pounds, and wearing blue jeans and a plain black shirt.  (R. at F-20-22; I-82-86.)  The only person besides Petitioner who could have matched the "tall" description was the 6'2" man, but he had a mustache, and it was undisputed that the robber did not have a mustache.  (R. at J-16.)  No one in the lineup besides Petitioner could have matched the clothing description of blue jeans and a plain black shirt.

### *(ii) Jameel White's Testimony*

The testimony most central to the state's theory of the case – that of Petitioner's cousin, Jameel White – was also suspect. White's testimony was in significant ways implausible or in conflict with the accounts of disinterested witnesses.  For example, he testified that when Petitioner pulled the shotgun out of his pants and approached the McDonald's counter, White immediately ran out the door, which was five feet away, and immediately thereafter heard a shot and ran across the road.

(R. at J-49-50, 69.)  White testified that he saw Petitioner flee the McDonald's by the time White was in the middle of the road, which testimony later established to be approximately 45-50 feet from the door of the McDonald's.  (R. at J-51, 158-159.)  According to the McDonald's employees, however, the robbery lasted much longer than White's account allows for – the robber stood at the counter for a "minute or two" before coming around behind the counter, and it was not until the manager appeared from the back and began to open the registers that the robber fired a shot, (R. at I-27-28, 97); and the robber took money one at a time from each of four registers before he finally fled the restaurant, (R. at I-32-34, 99; J-28-30).  White's account also conflicts with Nolan's and Ramos's in that, according to him, Petitioner did not approach the counter before drawing the shotgun, (R. at J-49), whereas Nolan and Ramos each testified that the robber first approached the counter without the gun and then came back a second time with the gun.  (R. at I-24-26, 94.)  Citing a faulty memory, White was further unable to explain why, just hours after the robbery, he told the police that when he exited the restaurant, he first sat in Petitioner's car (where the gun and cash were later found) for some period of time before running across the road to the Trak Auto.  (R. at J-67-68.)

White's testimony also directly conflicted with that of Thomas Gaston.  White testified that it was Petitioner who sought and

found a ride away from the Trak Auto, that the getaway driver was putting antifreeze into his van outside the store when Petitioner arranged to pay him for a ride, and that White did not know the driver but thought Petitioner knew him. (R. at J-53.) Gaston, however, testified that he was at the Trak Auto to buy antifreeze when he saw White – who he knew from the neighborhood – "peeking out" of the store's door. (R. at J-137.) According to Gaston, White then approached Gaston alone and asked if Gaston could give him a ride across the bridge in exchange for some money. (R. at J-137.) Gaston testified that White said the ride was for him and a friend, which turned out to be Petitioner, who had come from the aisles of the store with a bottle of transmission fluid or oil in his hand. (R. at J-136.) According to Gaston, White asked Gaston to back his van up to the store so that White and Johnson could easily climb into the back from the store, which they did, with White lying down and Petitioner kneeling by the wheel well. (R. at J-108.)

### (iii) Unexplained Evidence

Finally, the state's evidence leaves a number of facts and issues unexplained. For example, a restaurant patron on the day of the robbery told police that he saw two men flee from the McDonald's. (R. at J-141, 151-152, 154.) Similarly, as noted above, Monique Nolan originally told the police that two men approached the counter. (R. at J-147.) Additionally, as noted

above, both Ramos and Nolan insisted at trial that the robber was wearing black pants and a brown vest or jacket, (R. at I-24), yet it was undisputed that Petitioner was wearing blue jeans and a black shirt that day, and that no one wearing black pants and a brown jacket was ever arrested. Nor was anyone ever matched to the metal button that police found at the scene. (R. at J-226.) The state's evidence also leaves a significant amount of robbery proceeds unaccounted for. According to Officer White's police report, $787 was taken from McDonald's registers. (State's Ex. 5.) Yet a total of only $367 was actually recovered: police found $35 on Petitioner, (R. at J-249), Ron Tate turned in $102 from a Trak Auto shelf, (R. at J-220), and Petitioner's car contained $230, (R. at J-204). Given that Petitioner allegedly robbed the McDonald's alone, and police purportedly had complete knowledge of Petitioner's whereabouts and activities between the robbery and his arrest, and the absence of more than $400 dollars from the robbery gives pause regarding the state's theory of the evidence.

### c. Harmlessness Finding

Far from being "overwhelming," the evidence of Petitioner's guilt was shaky in significant respects, and he had a viable defense that depended largely on whether the jury found him to be credible. The state's repeated and brazen violation of the rule of *Doyle v. Ohio* was, in turn, central to its efforts to undermine Petitioner's credibility, and therefore his defense, and to obscure

weakness in its own case. As a consequence, when this Court asks itself, as instructed by the Supreme Court in *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), "Do I, the judge, think that the error substantially influenced the jury's decision?", the Court cannot in good faith answer in the negative.

To be clear, the Court does not conclude that there was insufficient evidence on which to convict Petitioner, or that Petitioner could not rightly have been convicted of a crime directly related to those for which he was convicted. Indeed, if the question was, would the jury have found Petitioner guilty with or without the *Doyle* error, this Court might be inclined to deny the petition, as the torn $20 bill and the two (admittedly problematic) eyewitness identifications supported the guilty verdict. But as a federal court assessing the harmfulness of a constitutional error, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946). After thoroughly reviewing the record in this case, the Court is in "grave doubt" regarding the harmlessness of the *Doyle* errors in Petitioner's trial.

### B. Petitioner's Remaining Issues

In addition to the *Doyle* issue, Petitioner seeks relief on several other grounds. As noted above, however, the Court concludes that each of Petitioner's remaining issue is not reviewable on its merits.

### 1. *Prior Convictions*

In addition to the *Doyle* violation, the state sought to undermine Petitioner's credibility by confronting him with his prior convictions, some of which had been previously ruled inadmissible by the trial court. First, the state noted the three convictions he had testified to on direct examination and asked him, "Sir, there is other cases that you were convicted of that your lawyer didn't ask you about?" (R. at K-111.) During a sidebar, the court ruled that the line of questioning was impermissible, as the Court had previously ruled that the state could only go into the three convictions that Petitioner discussed on direct examination. (R. at K-111-112.) Immediately following the sidebar, the prosecutor continued the line of questioning, asking "[t]hat's correct, Mr. Johnson?", drawing an immediate objection from defense counsel and an admonishment from the court that "[t]hat is it. Go into something else." (R. at K-113.)

Petitioner argues that this questioning, which undisputedly violated the trial court's earlier ruling on Petitioner's motion *in liminae* to exclude reference to certain of his prior convictions,

violated his due process rights.  Although the state contends that Petitioner failed to fairly present the issue to the state courts as a federal issue, the point is moot because the violation of a state rule of evidence ordinarily cannot form the basis for a due process claim.  *Koo v. McBride*, 124 F.3d 869, 874 (7th Cir. 1997); *see also*, *Watkins v. Meloy*, 95 F.3d 4, 6-7 (7th Cir.1996) ("[W]hen the state merely fails to limit the prosecution's evidence, the only constitutional principle to which the defendant can appeal is a catchall sense of due process. . . .  If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission.").  Nothing in this record suggests that the violation of state evidence rules here was so exceptional as to have deprived Petitioner of due process.

### 2.  *Burden of Proof Instructions*

Petitioner argues that the trial court gave an erroneous oral jury instruction that misstated the state's burden of proof regarding the offenses of armed robbery and unlawful possession of a weapon.  But federal courts generally "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640

(1991) (citations omitted). In the *habeas* context, this doctrine bars consideration of a petitioner's federal claims where the state court declined to address those claims because of the petitioner's failure to meet a state procedural requirement. *Coleman*, 501 U.S. at 729, 111 S.Ct. at 2553. In this case, to preserve an issue for review by an Illinois appellate court, "both a trial objection and a written post-trial motion about the claim are required." *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir.1995) (citation omitted). The Illinois Court of Appeals rejected Petitioner's claim on this issue because Petitioner failed to object to the purportedly defective instruction at trial and failed further to satisfy Illinois' "plain error" exception to the waiver rule. This Court is barred from considering this claim because the state court rejected it on an independent and adequate state ground.

### 3. Eyewitness Testimony Instruction

Petitioner's fourth proposed ground for *habeas corpus* relief is that the trial court gave erroneous eyewitness jury instructions. The propriety of jury instructions is generally a state law issue that is not cognizable on federal *habeas* review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Such a claim is only cognizable if it clearly implicates the petitioner's due process right to a fundamentally fair trial. *Perruquet v. Briley*, 390 F.3d 505, 511-512 (7th Cir. 2004). To be cognizable, the claim must do more than merely cite the Fourteenth Amendment right to a

fair trial. *Id.* at 512. Petitioner has not done so here. Although he cites the Fourteenth Amendment in his petition, his memorandum provides no link between the purported instruction error and the fundamental fairness of Petitioner's trial. Instead, Petitioner's memorandum exclusively discusses one of the state court's alternative bases for rejecting his claim, harmless error.

Even if this claim were cognizable, however, another of the state court's bases for rejecting it was waiver and failure to satisfy the Illinois plain error rule. As noted *supra*, waiver is an independent and adequate state ground precluding *habeas* review of the claim.

### 4. *Sufficiency of Aggravated Battery Evidence and Ineffective Assistance*

Petitioner's last two proposed grounds for *habeas corpus*, insufficiency of the evidence and ineffective assistance of counsel, suffer from the same fatal defect. The state correctly points out that Petitioner did not raise any of these claims in his petition for leave to appeal to the Illinois Supreme Court. Consequently, he failed to submit them to "one complete round" of state appellate review and has thus procedurally defaulted them. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Petitioner has additionally failed to even argue, let alone establish, either the "cause and prejudice" or "fundamental miscarriage of justice" exceptions to the procedural default doctrine. This Court is thus barred from reviewing these claims

### C.  Appointment of Counsel

As a final matter, the Court wishes to note that this case is rather complicated for a litigant to handle *pro se*.  Although it is Petitioner's right to use counsel or not, in the event of any further proceedings in this matter, this Court would recommend that Petitioner renew his earlier request for appointment of counsel.

### III.  <u>CONCLUSION</u>

For the reasons stated herein, Petitioner's Petition for a Writ of *Habeas Corpus* is Conditionally Granted.  The State of Illinois must either retry him or release him within 90 days from the entry of this judgment.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** February 1, 2008